## Case No. 12,016.

### ROGERS v. MECHANICS' INS. CO.

### [1 Story, 603; [1] 4 Law Rep. 297.]

Circuit Court, D. Massachusetts. Oct. Term, 1841.

MARINE INSURANCE —WHALING VOYAGE — CATCHINGS—CUSTOM—GENERAL AVERAGE.

1. A policy of insurance upon "outfits" and upon "catchings" substituted for the outfits, in a whaling voyage, protects the "blubber," or pieces of whale flesh, cut from the whale and on deck.

[Cited in De Grove v. Metropolitan Ins. Co., 61 N. Y. 604.]

2. Quære, whether the blubber stowed on deck or stowed in the proper place below deck would be covered by a policy of insurance on "cargo."

3. The usage or custom of a particular port in a particular trade is not such a usage or custom, as will, in contemplation of law, limit, control, or qualify the language of contracts of insurance. It must be some known general usage or custom in the trade, both applicable and applied to all ports of the state, and so notorious as to afford a presumption, that all contracts of insurance in that trade are made with reference to it, as a part of the policy.

[Cited in Howe v. The Lexington, Case No. 6,767a; Jelison v. Lee, Id. 7,256; Garrison v. Memphis Ins. Co., 19 How. (60 U. S.) 317; Adams v. Manufacturers' & Builders' Fire Ins. Co., 17 Fed. 633.]

[Cited in Howland v. India Ins. Co., 131 Mass. 252; Parkhurst v. Gloucester Fishing Ins. Co., 100 Mass. 306.]

4. Under the circumstances of the case, where a quantity of blubber was thrown overboard in order to preserve the ship from sinking in a violent tempest, it was *held* to be a subject of general average, covered by the policy.

[Cited in The Shand, 16 Fed. 574.]

This was an action of assumpsit [by Robert Rogers against the Mechanics' Insurance Company] on a policy of insurance, dated the 23d of August, 1838, whereby the Mechanics' Insurance Company, of New Bedford, insured ten thousand dollars on the bark America and outfits, from Bristol, Rhode Island, on a whaling voyage, until her return to Bristol, with liberty to touch at all ports and places for refreshments, and to sell catchings. The policy also contained a stipulation, that one fourth of the catchings should replace the outfits consumed; except that catchings, shipped from the Cape de Verds or this side, should be at the risk of the assured without diminution of value. The declaration alleged that during the voyage the vessel, having on board at the time a large quantity of blubber in the blubber-room, encountered a violent hurricane, during which the shifting boards in

1 [Reported by John A. Hayward, Esq., and Geo. C. Hazelton, Esq.]

1 [Reported by William W. Story, Esq.]

the blubber-room gave way, and the blubber all went to leeward; that in order to preserve the ship from sinking, it was necessary to throw the blubber overboard, and to cut away some masts; that afterwards the vessel was obliged to put away for the Isle of Mauritius to repair the damages of cutting away; that the expense of going there, making repairs, &c., together with the value of the blubber thrown overboard, constituted a general average loss; and that the defendants. as insurers, were bound to pay to the plaintiffs the sums, which the vessel and outfits ought to contribute toward that loss. Plea, the general issue. At the trial the facts were proved as set forth in the declaration, and also, that the blubber thrown over was equal to sixty-five or seventy barrels of sperm oil.

It was admitted, that the underwriters were liable for the general average occasioned by the repairs and expenses in going into the Isle of France. And the principal question was, whether the blubber, thrown overboard in the storm, was a subject of general average, covered by the policy, under all the circumstances.

Mr. Coffin, for defendants, contended: (1) That the blubber, thrown overboard, was not a part of the cargo of the bark, within the meaning of the policy, and the loss thereof was not covered thereby. (2) That the blubber was not an article of value, for which contribution could be claimed in jettison. That a technical meaning was attached to the word "catchings" in whaling voyages; and that until "catchings" became "cargo," which they did not until reduced to oil, and put into casks under deck, they were not deemed cargo, nor an insurable interest in policies upon whaling voyages. (3) That it was impossible to put any value whatsoever upon blubber, while it remained in that state, so uncertain was the amount of oil, which could be made therefrom, and so much depended upon the state of the weather and the ability to reduce it to oil within a few days; for, otherwise. it became decomposed and worthless. That the blubber, in the present case, was utterly worthless, and without value, when thrown overboard. (4) That by the usage and custom of the whaling business in New Bedford, blubber, in this situation, not reduced to oil, is not deemed an insurable interest, or entitled, or liable to contribution in general average.

C. G. Loring and F. C. Loring. e contra, contended against the whole doctrine on the other side. They insisted. that "catchings" were. by the present policy, perfectly covered, as an insurable interest, as a substitute for "outfits." That the memorandum in the policy showed this. It is there stated: "In whaling risks it is understood, that one fourth part of the catchings shall replace the outfits consumed. except that catchings shipped home from the Cape de Verds on one side shall be at the risk of the assured, without diminution of the value of the outfits at the time." That the question was not, whether the blubber was at the time "cargo," but whether it was "catchings" in the sense of the policy; and it clearly was, being under deck and in the blubber-room. whatever might have been the case, if on deck, or alongside the ship. They cited Weskett, Ins. tit. "Greenland," p. 265 (folio edition); 2 Phil. Ins. (2d Ed.) 78.

Evidence was offered by Coffin to establish the supposed general custom, as to blubber not being an insurable interest, in policies on whaling voyages, or entitled or liable to contribution.

STORY, Circuit Justice. It does not strike me, that, upon the evidence produced by the defendants, it is possible to maintain the doctrine, contended for by their counsel. Nearly every witness, whose deposition is in the case, has testified, that the blubber in the present case is, in his opinion, "catchings," in the sense of that word, as it is understood in the whaling business. Most of the witnesses have added, that they should have considered. the blanket pieces (as they are called), of the whale, when cut from the whale, and put on the deck of the ship, also as "catchings." And some of them have gone further, and asserted, that, according to their understanding, a dead whale, when fastened alongside the ship, for the purpose of being cut up, falls within the same denomination. Now, the question, in this case, is not, what, in the sense of a policy of insurance on "cargo," would be treated as cargo, whether such goods only, as are stowed under deck, or whether other goods, which are insured. and are ordinarily and properly stowed upon deck. under the usage of a particular trade. are not also to be deemed cargo, with reference to a policy of insurance in that trade; for the word "cargo" does not occur in the present policy. The insurance is upon "outfits," and upon the "catchings" substituted for the outfits in the course of the voyage. Now, the construction of the words, "outfits" and "catchings," is, in the absence of any peculiar technical meaning thereof by the usage of trade, a matter of law for the decision of the court; and these words must have the ordinary meaning, belonging to them in the language of common life and common sense. in the absence of any such technical meaning. So far, as I am able to perceive, the testimony of the principal witnesses completely establishes, that, when the blubber, or pieces of whale flesh are cut from the whale, and are on the deck, or at least. when they are stowed under deck, they are in the sense of the trade, "catchings"; and certainly they are so in the import attributed to the word in common life. What other meaning can we properly apply to "catchings." unless it be, that they are things caught, and in the possession, custody, power, and dominion of

the party, with a present capacity to use them for his own purposes? I cannot find, then, from the testimony, that there is any technical meaning to the word in the whale fishery, which is not coincident with the ordinary meaning of the word. Whether the blubber, when stowed on deck, or at all events, when stowed in its proper place below deck, would not also be covered by a policy of insurance on "cargo," I do not decide; for it is unnecessary in the present case. That is a point, which might deserve consideration under other circumstances, and would be governed by the analogies of the law, and the usages of the particular trade.

Then, as to the point, that by the usage or custom of trade in whaling voyages, blubber, in this condition, is not deemed an insurable interest, or entitled to, or liable for contribution; there is no evidence whatsoever, in the cause, which, in a legal view, establishes any such usage or custom, even in the port of New Bedford. Even if such a usage or custom were shown to exist in New Bedford, that would not be sufficient. The usage or custom of a particular port, in a particular trade, is not such a custom, as the law contemplates to limit, or control, or qualify the language of contracts of insurance. It must be some known general usage or custom in the trade, applicable and applied to all the ports of the state, where it exists; and from its character and extent so notorious, that all such contracts of insurance in that trade, must be presumed to be entered into by the parties, with reference to it, as a part of the policy. If the usage or custom be not so notorious; if it be partial, or local in its existence or adoption; if it be a mere matter of private and personal opinion of a few persons engaged therein; it would be most dangerous to allow it to control the solemn contracts of parties, who are not, or cannot be, presumed to know it, or to adopt it, as a rule to govern their own rights or interests. Indeed, in the present case, as has been suggested at the bar, the policy in its printed form refers, not to the usages and customs of New Bedford, but to those of Boston. But not a single witness has spoken of his knowledge of any such general custom or usage, even in New Bedford. On the contrary, all of them deny any knowledge of such usage or custom, and only speak of their own opinions, how the interpretation of the language of the policy ought to be, and is understood by them personally. But this court has nothing to do with the private opinions of witnesses, however respectable, upon matters, which respect the interpretation of contracts. That is matter of law, which the court itself is bound to expound, in the absence of any usage or custom, which impresses upon the words a peculiar and technical meaning. I own myself to be no friend to the indiscriminate admission of evidence of supposed usages and customs in a peculiar trade and business, and of

the understanding of witnesses relative thereto, which has been in former times so freely resorted to; but which is now subjected by our courts to more exact and well defined restrictions. Such evidence is often, very often, of a loose and indeterminate nature, founded upon very vague and imperfect notions of the subject; and, therefore, it should, as I think, be admitted with a cautious reluctance and scrupulous jealousy; as it may shift the whole grounds of the ordinary interpretation of policies of insurance and other contracts.

As to the other point, I cannot entertain any doubt, that this blubber was as much entitled to, and liable to contribution, in cases of a jettison, as any other property on board. It is property; and if it is of any, the slightest, assignable value, and is sacrificed for the common benefit, it constitutes a claim for general average. It is said, that it is difficult, and indeed impracticable, to ascertain its true and exact value, when thrown overboard. There may be difficulty, and perhaps an impossibility, to ascertain its exact and minute value, for we have no means of weighing it in scales, or fixing its positive price. But the same difficulty occurs in many other cases of insurance; as in cases of injuries to sails, or rigging, or spars, by tempest, or by cutting them away, in cases of jettison; and yet no one doubts, that they must be contributed for according to their value, ascertained by a jury, in the exercise of a sound discretion, upon proper evidence. Suppose, that fruit is insured, and the vessel has a long passage, in which, by ordinary waste and decay, it must suffer some deterioration, and, then, a storm occurs, in which it suffers other positive damage and injury, or there is a jettison thereof; how are we to ascertain, what diminution is to be attributed to natural waste and decay, and what to the perils of the seas? or what was its true value at the time of the jettison? There can be no positive and absolute certainty. The most, that can be done, is, to ascertain, by the exercise of a sound judgment, what, under all the circumstances, may reasonably be attributed to one cause, and what to the other. Absolute certainty, in cases of this sort, is unattainable. All, that we can arrive at, is, by an approximation thereto; and yet no man ever doubted, that such a loss must be paid for, if it is covered by the policy. If, indeed, this blubber, at the time when it was thrown overboard, was entirely worthless, and had no assignable value, it certainly cannot be brought into general average; for, under such circumstances, nothing has been sacrificed, and, of course, nothing is to be contributed for. But this is a matter, which will most properly come before the assessor, who, by the agreement of the parties, is to be appointed to ascertain the amount of the general average, and also of the contributory interests.

Upon this opinion being expressed by the court, a verdict was taken for the plaintiff, subject to be altered by the report of the assessor,

as to the amount of damages, and of the contributory interests.

[For a hearing on questions arising upon the report of the assessor, see Case No. 12,017.]