[Civ. No. 258.    Third Appellate District.—April 3, 1907.]

## HALE BROS., a Corporation, Respondent, v. EDWARD F. MILLIKEN and FOSTER MILLIKEN, Copartners, etc., Appellants.

ACTION FOR BREACH OF CONTRACT—FAILURE TO DELIVER STEEL FOR BUILDING AS AGREED—DAMAGES—SUPPORT OF VERDICT.—In an action to recover damages for breach of contract in failing to deliver steel for plaintiff's building, as agreed, where there is sufficient evidence to show that the contract was broken in failing to deliver the steel in the condition and within the time required, and the evidence was conflicting as to the damages arising from the breach, and the verdict for the plaintiff was sufficiently supported by the plaintiff's witnesses, the verdict cannot be disturbed upon appeal.

ID.—LIMIT OF POWER OF APPELLATE COURT—REVIEW OF EVIDENCE.—The evidence must be so plainly and palpably insufficient to support the verdict that it can be said that such is the case, as matter of law, before this court is justified in setting aside a verdict upon the evidence or disturbing the findings of the trial court. A verdict finding the facts in a particular way forecloses any inquiry as to the credibility or discredit of witnesses by cross-examination.

ID.—EVIDENCE—CIRCUMSTANCES ATTENDING CONTRACT—KNOWLEDGE BY DEFENDANT'S AGENT—DAMAGES RESULTING FROM BREACH.—Evidence was admissible to show all of the circumstances leading up to and attending the execution of the contract which were known to the defendants through their agent acting within the scope of his authority in the execution thereof, including a lease which explained the necessity for prompt delivery required by the contract; and when such special circumstances were thus known to both parties, the damages resulting from the breach of the contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from its breach under such known circumstances.

ID.—EVIDENCE OF USAGE INADMISSIBLE—LEGAL STANDARD OF WEIGHTS AND MEASURES.—Where there is nothing in the contract to show the adoption of any other standard for the measurement of steel furnished under the contract, the legal standard of weights and measures fixed in this state must be deemed to enter into and become part of the contract executed therein, and evidence of local usage in San Francisco among manufacturers of and dealers in structural iron and steel to give a figured or estimated weight according to dimensions, instead of "scale" weight, determining the actual number of pounds therein, is inadmissible to vary the legal effect of the contract.

ID.—REPETITION OF EVIDENCE.—Where proposed evidence is already before the jury, no injury could result in disallowing its repetition.

ID.—REJECTION OF LETTER UNPREJUDICIAL.—Any error in the rejection of a letter from defendants' agent to plaintiff's agent was without prejudice, when defendants presented to the jury all that could by any possibility have been shown by the rejected letter.

ID.—LETTER ADMITTED ON CROSS-EXAMINATION—RIGHT OF EXPLANATION. Where a letter written by a witness was admitted on cross-examination, as tending to show a discrepancy, the witness was properly allowed, on re-examination, to explain the circumstances under which it was written, and the reason for writing it.

ID.—INSTRUCTIONS.—*Held,* that in the instructions given, in view of the circumstances of the case developed by the evidence, there was nothing that could have prejudiced the appellants.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. W. P. Lawlor, Judge.

The facts are stated in the opinion of the court.

P. H. Dunne, and Walter H. Linforth, for Appellants.

Campbell, Metson & Campbell, Jas. H. Budd, and Thomas H. Breeze, for Respondent.

HART, J.—The plaintiff corporation brought this action to recover from the defendants the sum of $13,973 for damages alleged to have been sustained by it on account of the failure of defendants to deliver within the time agreed upon certain steel to be used in the erection of plaintiff's building in the city of San Francisco. The alleged damages consist of the following items: 1. The sum expended by plaintiff in the preparation of the steel for use after its delivery, $577.65, the pleaded agreement being that it should be delivered in condition so that it could be placed as received in the building; 2. Ground rent at the rate of $1400 per month for a period of three months; 3. Interest on the money expended by plaintiff in the building independent of the steel work during the time of the delay, aggregating the sum of $396.32; 4. The loss to plaintiff of the use of the building for three months, alleged to be of the value of $3,000 per month, or a total of $9,000.

On the twelfth day of October, 1899, plaintiff leased from one David R. Jones, for a term of ten years and nine months, the said lease to take effect on the first day of October, 1899, at a monthly rental of $1,400, a certain lot or piece of real property, situated in said city of San Francisco, and upon which it contemplated the erection of a large building to be used for carrying on and conducting its commercial business. Ground rent was not, however, to become payable under the lease until from and after the 1st of July, 1900. It is alleged by plaintiff that with a knowledge of this lease and of its terms, defendants entered into a contract with plaintiff to furnish the steel necessary for the erection of said building and to deliver the same during the month of February, 1900. It is claimed by plaintiff that if the steel had been delivered during said month of February the building could have been "erected and completed so as to admit of occupancy on July 1st, 1900, but that the building was not completed and ready for occupancy before the 1st of October, 1900, and that the delay was occasioned through the failure of the defendants to deliver the steel within the contract time and to deliver in such condition as to be immediately set up in the building upon its arrival in San Francisco." The complaint further alleges that during the negotiations between plaintiff and defendants for the furnishing of the steel for said building "defendants submitted to plaintiff two lists of prices at which they agreed to sell and deliver to plaintiff the steel work required in said building. One of said list prices was for the delivery of said steel work during the month of February, 1900, and the other for the delivery of said steel work during the month of May, 1900; that the prices on the latter list were much lower than those on the other, and both lists of prices provided for f. o. b. delivery." In order to secure the delivery of the steel in the month of February, it is alleged, plaintiff, on the tenth day of January, 1900, agreed to pay the defendants the prices demanded for the February delivery of the steel, the same being a sum in excess of that of the May delivery to the extent of $4,105.22. The complaint was verified.

The answer specifically denies the averments of the complaint, and pleads a counterclaim, and prays, among other things, for judgment against the plaintiff for the sum of $6,884.50, alleged to be the balance due defendants from plain-

tiff for the structural steel so furnished it by defendants. It may be here stated that the original balance claimed to be due defendants from plaintiff was the sum of $7,042.65, but that the sum of $156.15 was deducted by defendants from their claim because of extra labor imposed upon the steel-setter by reason of "shop errors" imputed to the oversight or negligence of defendants in arranging the steel, preparatory to its erection as a part of the building.

The cause was tried by jury, and a verdict returned in favor of plaintiff in the sum of $186.41, "after deducting the amount of defendants' counterclaim." Thereupon, and in accordance with said verdict, the court entered its judgment in favor of plaintiff in the sum of $186.41. Defendants appeal from said judgment and from an order refusing them a new trial.

Much space in the briefs of counsel is devoted to a discussion of the evidence, appellants attempting by a minute examination and analysis thereof to demonstrate that the jury awarded damages in favor of plaintiff far in excess of what the facts adduced justified. The contract for the purchase and sale of the steel for the building was made and entered into between Reid Bros., architects and agents of plaintiff, and N. L. Bell, the Pacific Coast agent of defendants. The place of business of defendants was at the time of the transaction in the city of New York, and the headquarters and office of their agent, Bell, were, at the time of the making of the contract, in the city of San Francisco.

The record consists of a transcript of four hundred and ninety pages, of which the evidence takes up approximately four hundred pages. It would be useless, we think, to undertake to discuss in detail the entire mass of evidence, or to attempt to present a satisfactory synopsis thereof, for the purpose of showing reasons why the verdict should or should not be disturbed. The record discloses the fact that most of the evidence is from witnesses produced by plaintiff, and that it points almost all one way. There is no dispute that a contract for the sale and purchase of the structural steel required for the erection of the building of plaintiff was made by the parties. The only questions in the case are, so far as the facts are concerned, whether there was on the part of the defendants a breach of the terms of the contract, and, if so, whether or not the damages awarded are excessive.

The plaintiff, having leased for a long term the ground upon which the building was to be erected at a monthly rental of $1,400, to become payable on and after the first day of July, 1900, was, quite naturally, anxious to secure the steel materials necessary for the construction of the structure at as early a date as possible, so as to enable the contractors to complete and have it in readiness for occupancy by the time at which payment of the ground rent was to begin. That this purpose was uppermost in the mind of plaintiff, and well understood by defendants at the time of the making of the contract, is, in our opinion, indubitably evidenced by the several conversations shown to have taken place between the parties relative to the steel contract. These conversations are testified to not alone by witnesses friendly to plaintiff, but by Mr. Bell himself. The telegraphic dispatches from Bell to the defendants concerning the contract also sustain this conclusion. Another significant circumstance bearing out the contention of respondent upon this point is the fact that the plaintiff was willing and agreed to pay for the steel the sum of a trifle over $4,000 demanded for February shipments in excess of the prices asked for May shipments. In other words, it agreed to pay $4,000 more for the steel in order to secure early shipments and delivery thereof than it would have been compelled to pay for the same material delivered in the month of May. The lease of the ground and the time at which the payment of the rent, by the provisions of said lease, was to commence, and the consequent anxiety of plaintiff to be in actual occupancy of the premises by the time the payment of the rent was to begin, were matters of full and frequent discussion between the parties, not only before the agreement of sale and purchase between them was reached, but throughout the entire course of the relations established between them by virtue of the contract. Telegrams were sent to defendants by their agent, explaining the circumstances under which the contract was made. While it may be correct to say that nothing was expressly said in these telegrams about the lease, the defendants, nevertheless, knew that haste and prompt delivery of the steel were important features of the contract, as is clearly shown by their replies to their agent. But, whether the defendants themselves knew, or did not know, the reason for the requirement of prompt delivery, the fact is undisputed that their agent did know the reason and knew

that that was the principal consideration controlling plaintiff in awarding the contract for the steel to the defendants. After the defendants, in response to a telegram from Bell, sent by wire the "February prices" for the steel required, the plaintiff, through its agents, Reid Brothers, in a letter addressed to Bell, accepted the same, and requested the latter to inform defendants that the plans, specifications and drawings were with P. C. Hale, at 256 Church street, New York, and, in order (quoting from the letter to Bell) "to save time, to please ask your firm to call on P. C. Hale for the drawings and specifications . . . to look over carefully and wire you if everything is complete to proceed at once." In pursuance of this suggestion, Bell sent the following telegram to defendants: "Get plans P. C. Hale, 256 Church street. Have secured contract. Prices quoted *February delivery.* Examine plans and wire immediately if everything is clearly shown thereon." The evidence shows that defendants, upon receipt of the last-quoted dispatch, at once obtained from P. C. Hale the plans and specifications mentioned. On the following day, Milliken Brothers wired their San Francisco agent as follows: "Plans received and are being carefully examined. . . . The specifications call for Carnegie sections. Our bid of course was not based on their sections. . . . We suggest, in order to secure *prompt delivery required* [italics are ours], that we be allowed to substitute equivalent areas of angles and plates, or channels and plates, whichever can be secured quickest, in column schedule." Reid Bros., having been notified by Bell of this telegram and the proposed substitution of "equivalent areas of angles and plates," etc., for the Carnegie sections called for by the plans and specifications, addressed the following letter to the agent of the defendants: "There is no objection to your people substituting equivalent areas of equal strength and not exceeding in weight those shown of Carnegie Steel Company. . . . *Prompt delivery* has secured you this work, and is a very essential feature of the contract, so do not fail to impress upon your people the importance of it, and also the importance of shipping in the regular order called for in specifications." The order of shipments, contained in the specifications, provides: "In order to avoid delay in erection, material must be shipped in the order in which it is to be placed, *i. e.,* beginning at the basement, each story and floor must be shipped in such complete man-

ner as to allow each of said stories or floors to be entirely completed in its erection, and ready for immediate reception of masonry and walls." A few days after the 10th of January, according to the testimony of Mr. Bell himself, Mr. Reid informed him that the first shipment of steel would be required the last of February or the first of March. This shipment was to include all the material necessary to complete the first tier, and Reid requested Bell to have the steel shipped "tier by tier at intervals approximately one week apart." By "tier" was meant a floor complete—that is, one story. The foundation work was finished during the month of February, and the construction had so far progressed that by the 1st of March the builders were prepared to begin the erection of the steel work.

The evidence shows that the building was not completed so that it could be occupied until about the 1st of October, 1900—approximately, if not actually, three months after the payment of ground rent, under the lease, had commenced. Witnesses for plaintiff—real estate dealers in San Francisco— testified as to the rental value of the premises from July 1, 1900, to October 1, 1900, and such value was by them variously estimated at from $2,500 to $3,200 per month. Witnesses for the defendants placed the rental value at a considerably lower figure.

The delay in the erection and completion of the building was occasioned, according to the testimony of Reid, the architect, Lang, the brick and wood contractor, and Arthur, the steel-setter, to so-called "shop errors"—that is, errors made at the manufactory in the numbering of the columns and the adjustment of the connections of the steel—and to misshipments—that is to say, shipments out of order and in a haphazard manner. For illustration, it was stated by Mr. Reid that the first tier or floor was, as shipped, incomplete, and that tiers were shipped for floors not prepared or ready for steel erection in advance of those floors ready for the steel material. The delay thereby occasioned had, it is shown, and, as would necessarily follow, a reactionary effect upon the work of masonry and carpentry. In other words, the brick and wood contractors were necessarily delayed by reason of the delay due to the misshipments. The building is not what is known strictly as a steel structure. Mr. Reid testified that the delay, caused by the manner in which the steel was

shipped, covered a period of three months. Mr. Lang, the brick and wood contractor, stated that the delay in brick and carpentry work, occasioned by the nonarrival of the steel at the time and in the manner and order in which the contract called for its shipment, was two months and eighteen days.

There is no evidence in the record offered by the defendants directly contradictory of that of which we have presented a recapitulation. Counsel for defendants, however, undertake to show by an extensive argument based upon certain apparent discrepancies developed through the cross-examination of some of the principal witnesses for the plaintiff, that the amount of damages assessed by the jury is unwarranted by the evidence. But, under the well-understood rule, where there appears a substantial conflict in the evidence (and we think, as we have before suggested, that the testimony was pretty much all one way upon the important points), we are precluded from going into the question thus presented. The evidence must be so plainly and palpably insufficient to support the verdict that it can be said that such is the case as a matter of law before this court is justified in setting aside a verdict upon the evidence or disturbing the findings of the trial court. The record here does not authorize us to make any such ruling. The discrepancies or inconsistencies which may have been brought out by an examination or by cross-examination of the witnesses are also matters for the jury to pass upon and settle to their own satisfaction. Their verdict, finding the facts in a particular way, forecloses us from any inquiry into the question as to whether certain witnesses declared the truth or otherwise, or whether inconsistent statements which may have been shown by their cross-examination were sufficient to have discredited their testimony or not. The statement thus made of this proposition is only a trite declaration of the rule by which appellate courts are uniformly governed in this country with respect to their power of reviewing questions of fact. It is enough to say, however, that we have given the record careful and painstaking examination, and our conclusion is, upon this point, that the verdict and judgment are abundantly supported by the evidence.

There were numerous objections interposed against the admission of certain evidence, some of which are not discussed in the briefs, and, therefore, not urged here. As to some

of the objections, it may be said, generally, that in a case of the character of the one at bar, as disclosed by the pleadings, it is proper to show all the circumstances surrounding the transaction leading up to the making and the manner of the execution of the contract. The circumstances which led to the making of this contract were fully made known to the defendants, or their agent, who was acting within the scope of his authority as such in all his dealings with plaintiff, and it was, as we have declared, proper to place them before the court and jury. The lease between plaintiff and Jones, which explained the reason of the requirement of an early and prompt and proper delivery of the steel, and to the admission of which into the record objection was made, not only constituted relevant but important testimony. It, in fact, became a part of the contract, through other testimony, to the extent of fixing the time at which the steel should be delivered. Evidence of consequential delay—that is, the delay occasioned to the contractor of the masonry and woodwork and the delay caused to the steel-setter, was proper to be received and considered by the jury in the determination of whether or not the contract was, in fact, broken through the negligence of defendants and as finally aiding in the ascertainment of the amount of damages, if any, to which plaintiff was entitled by reason of the alleged breach of the contract. It would seem to require the citation of no authorities to uphold the position that special circumstances, if any, which might have entered into the making of the contract, or those attending its breach, if known to both parties, may be shown. The principle authorizing such evidence is quite elementary, and the books are replete with authorities illustrating its application. "If the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of the contract under the special circumstances, so known and communicated." (*Hadley* v. *Baxendale,* 9 Ex. 341; see, also, *Mitchell* v. *Clarke,* 71 Cal. 163, [60 Am. Rep. 529, 11 Pac. 882]; *Hawthorne* v. *Siegel,* 88 Cal. 159, [22 Am. St. Rep. 291, 25 Pac. 1114], et seq.; *Booth* v. *Mill Co.,* 74 N. Y. 15;

*Long Island R. Co.* v. *Verree,* 69 N. Y. 489; *Richardson* v. *Chynoweth,* 26 Wis. 656.)

But the most important point presented is raised by the contention that the court below erred in refusing to permit defendants to show that there prevailed, and for many years had existed, in the city of San Francisco, "a general well-known usage among manufacturers of and dealers in structural iron and steel, similar to that furnished by defendants, as to the manner and way by which the weight of the material was determined and arrived at." The contract is silent, so far as express language is concerned, as to how the weight of the steel was to be determined—whether by what is known as "figured" or estimated weight, or by "scale" weight. The former, as we understand it, is the means of ascertaining the weight by a standard, fixed and adopted by dealers in structural steel. For example, steel columns, girders and other connections necessary for the steel part of the structure, according to their dimensions, are given a standard weight by manufacturers and dealers in such materials. "Scale weight" is the determination of the weight by what the material actually weighs in pounds. It is contended by appellants that if there existed in San Francisco, at the time of the making of the contract, among dealers in such material, a custom, according to which the manner or method of ascertaining the weight of structural steel was determinable, then the contract is to be presumed to have been made with reference to such custom and that it, therefore, became a part of said contract. Several California cases are cited in support of this view, but we do not think that they are exactly in point, or, at least, ought not to be held applicable to the case here. The contract is evidenced by conversations, telegrams, letters, and the plans, specifications and drawings. There is no controversy between the parties that the prices offered by defendants and accepted by plaintiff were for "so much per pound"; but it is claimed by appellants that the word "pound" "is of technical significance when used in connection with the sale of structural steel." But appellants first make the claim that their contention for figured weight is sustained by a certain clause in the specifications. The clause referred to reads: "Figured dimensions in all cases to be taken in preference to scale measurements, and no important dimensions shall at any time or under any

5 Cal. App.—23

circumstances be determined by scale, but should drawings not show all required dimensions in figures, the contractor is to apply to the architects for such figures, and shall all conform to them as a part of the contract." According to the interpretation of that clause by appellants, the contract itself, of which the specifications became a part, expressly points out that the quantity of steel furnished shall be determined by figured or dimension weight. But that clause is not open to such a construction. If it were, then certainly, as pertinently suggested by counsel for respondent, the court's ruling in excluding the proffered testimony relative to the alleged custom could not be error, since to prove by parol what in terms the contract already provides for would be the work of supererogation or the assumption of an unnecessary burden by defendants. The clause is manifestly addressed to the contractor for his guidance in the erection of the building. The real meaning of it is so clearly explained in the brief of respondent that we shall adopt the language of counsel in the statement of what we conceive to be its true construction: "The clause plainly means that lengths are not to be calculated from the lines of the plans which obviously were drawn on a reduced scale. If dimensions are noted on the plans in figures, they shall prevail over scale or measured dimensions. If on any line the length is not noted in figures, the contractor must not calculate its length by scale, but must apply to the architect for the figures." The contention as to the meaning of that clause being thus disposed of, the question remains, Did the court err in disallowing the testimony offered to prove the alleged usage?

The legislature of this state has established a standard of weights and measures, according to which, by the provisions of section 3222 of the Political Code, "all contracts made in this state for work to be done or for anything to be sold or delivered by weight or measure," must be construed. The standard of weights and measures is thus fixed by section 3209, *supra:* "The standard of weights . . . . now in charge of the Secretary of State, being the same that were furnished to this state by the government of the United States, and consisting of . . . . nine avoirdupois weights of one, two, three, four, five, ten, twenty, twenty-five and fifty pounds, respectively, . . . are the standards of weights . . . throughout this state."

There is no allegation in the answer, either in the denial of the averments of the complaint, or in the paragraphs setting out the counterclaim, that the word "pound," as used in the contract as pleaded, was understood by the parties in any other sense than its ordinary and primary and *legal* signification. It will, of course, be conceded that the phrase "avoirdupois pound," as used in, the statute, and as commonly understood, means sixteen ounces in weight. (Pol. Code, sec. 3215.)

The case of *Higgins* v. *Cal. Petroleum Co.*, 120 Cal. 629, [52 Pac. 1080], so much relied on by defendants, was where the plaintiff brought an action to recover "certain royalties on certain bituminous rock and liquid asphaltum mined by defendants," for which the latter agreed to pay "the sum of fifty cents per ton for each and every *gross* ton." The question there was, What did the parties mean by the word "gross"? Evidence was admitted at the trial for the purpose of showing that by usage at the place where the contract was made the word "gross" as used in the contract means a "long ton," or a ton consisting of "two thousand two hundred and forty pounds," and the court made a finding accordingly. The supreme court sustained the ruling, saying: "The contention of appellant is, that the statute defines the meaning and use of the word 'ton' (Pol. Code, sec. 3222), and that the lease is unambiguous and cannot be explained or contradicted by parol evidence; therefore, there could have been no evidence at the trial justifying the finding of the court that the phrase 'gross ton' used in the lease meant a long ton of 'two thousand two hundred and forty pounds.' Some decisions are cited apparently holding that a contract of this nature must be conclusively presumed to refer to the statutory weights and measures—at least, in the absence of a direct and express reference in the contract to a different standard—and in this connection it is argued that the adjective 'gross' does not refer to the measure—that is, to the number of pounds in the ton—but to the condition of the commodity when weighed, to wit, that the crude and unrefined asphalt is to be weighed, and not the refined product. I think the question is entirely settled by section 1861 of the Code of Civil Procedure, which reads as follows: 'The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless

admissible that they have a local, technical or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly.' '' The same question was presented in the case of *Higgins* v. *Cal. Petroleum Co.,* 109 Cal. 310, [41 Pac. 1087]. There no evidence had been offered or received relative to the meaning of the word ''gross.'' The court, in the latter case, held that ''gross ton'' meant the usual ton of two thousand pounds avoirdupois, and that the word ''gross'' as used signified and was intended to describe the crude or unrefined product. In the case in the 120th Cal., subsequently tried, evidence was, therefore, admitted to show what must have been really intended by the use of the word ''gross.'' It will thus be seen that the whole question in the Higgins case turned upon the meaning of the word ''gross,'' as employed.

The very purpose, obviously, of laws establishing standards of weights and measures, is to render certain and unequivocal the meaning of the language of contracts involving matters to which such laws relate, by a comparison of the language of the contracts with that of the law, and thus relieve the courts, in some measure at least, of the perplexing difficulties which must often confront them in seeking the actual intention of the parties to such contracts. The legislature has wisely declared that it is the better policy that there should be a general law, effective and operative throughout the whole state, regulating such matters, and of which all persons are conclusively presumed to have knowledge, and through the assistance of which all contracts pertaining to the subject matter of the statute may be satisfactorily construed. Viewed thus by the light of the written law, it is manifest that the opportunity for mistakes in an effort to ascertain what parties mean by the language of such contracts is at least minimized, if not altogether obviated. ''If,'' as is well said in *Evans* v. *Myers,* 25 Pa. St. 114, ''every section of the country may have its own weights and measures, to be established by its own customs, strangers would be entrapped into liabilities which they never intended to incur, and no one could know with precision the extent of his obligations.'' (See, also, *Green* v. *Moffett,* 22 Mo. 529; *Harris* v. *Rutledge,* 19 Iowa, 388, [87 Am. Dec. 441].) The legislature certainly meant something by the enactment of the

law regulating weights and measures, and the rule involved in section 1861, Code of Civil Procedure, should not be so applied as to operate, practically, to repeal or nullify the entire chapter upon the subject of weights and measures. The law is founded upon experience and the soundest policy, and is, like all such enactments, designed for the better protection of the rights of parties acquired under such contracts. Is it to be doubted that the courts, in the construction of contracts, may feel an infinitely greater degree of assurance that they will arrive at a correct conclusion where in the exercise of that all-important judicial function they may be guided by the unflickering light of the written law rather than by some alleged usage of trade, proved, it may be, by conflicting evidence? We think the rule of construction of such contracts ought to be, as contemplated by the legislature, that they are to be conclusively presumed to have been made in reference to the statute, unless the parties themselves have agreed or indicated in their contracts that their execution is to be governed by some usage of trade or custom prevailing in the community where they were made, or their terms are to be performed. Such a construction would give force and effect to the statute and could not interfere with the operation in appropriate cases of section 1861 and other code provisions established for the interpretation of contracts whose terms are expressed in doubtful or ambiguous language. And when we use the term ''doubtful or ambiguous language,'' we mean language whose true meaning can find no exposition by reference alone to the language of the law itself, an end which we think can be attained in the cases of contracts of the kind under consideration.

Section 3222 of the Political Code is garbed in language as clear as a cloudless day, and, as observed, provides that ''contracts made within this state for work to be done or for anything to be sold or delivered by weight or measure, *must* be construed according to the *foregoing* standards,'' referring to the preceding section establishing the standards of weights and measures. Is it to be held that that section means nothing? Is there to be found any enacted proviso qualifying the provisions of the law as to weights and measures in any particular so that they may be disregarded with impunity?

In *Rogers* v. *Mechanics' Ins. Co.*, 1 Story, 603, 608, [Fed. Cas. No. 12,016], Judge Story uses the following language:

"I own myself no friend to the indiscriminate admission of evidence of supposed usages and customs in a peculiar trade and business, and of the understanding of witnesses relative thereto, which has been in former times so freely resorted to, but which is now subjected by our courts to more exact and well-defined restrictions. Such evidence is often, very often, of a loose and indeterminate nature, founded upon very vague and indefinite notions of the subject; and, therefore, it should, as I think, be admitted with a cautious reluctance and scrupulous jealousy, as it may shift the whole grounds of the ordinary interpretation of policies of insurance and other contracts."

At page 656 of the second volume of his work on Contracts, Judge Parsons says: "Where certain things are to be done by the contract which the law has regulated in whole or in part, the contract will be held to mean that they should be so done as would be either required or indicated by the law."

"The true office of usages of trade," says Greenleaf, section 251, volume 2, of his work on Evidence, "is to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts, arising not from express stipulation, but from mere implications, and acts of a doubtful and equivalent character; and to fix and explain the meaning of words and expressions of doubtful or various senses."

" . . . But, although evidence of custom and usage may be introduced in a case to show what the meaning of the parties was in regard to the subject matter of the contract, or to explain the meaning given in particular trades or occupations to certain words, yet evidence cannot be introduced of the custom when the same contradicts the plain and unambiguous words of the contract or violates a settled legal rule of construction." (*Bigelow* v. *Legg,* 102 N. Y. 652, [6 N. E. 107].)

The "settled legal rule of construction" in this state as to such contracts is to be found in the provisions of the law fixing the standard of weights and measures. The legislature has said so in section 3222 of the Political Code. The word "pound," whose meaning is sought to be modified or changed, does not and cannot render the contract ambiguous, because it is a statutory word. "Evidence cannot be introduced of the custom when the same contradicts the plain and unambiguous words of the contract," says the court in *Bigelow* v.

*Legg,* 102 N. Y. 652, [6 N. E. 107].  There is no claim here, either expressly made, or deducible from the pleadings, the evidence or the briefs, that during the negotiations of the parties there was any discussion by or understanding between them that the word "pound" should be used in the contract in any other sense than the usual or statutory one.  The contract, as pleaded, is clear and unambiguous.  There is no obscurity in its language, and there can be shown no just reason why the word "pound" should be subjected to an interpretation by one of the parties peculiar to himself or his own views.

We are not to be understood as questioning the ruling in the Higgins case, 120 Cal. 629, [52 Pac. 1080], in so far as it concerns the application of section 1861, Code of Civil Procedure, to the peculiar circumstances of that case.  But we do think that the decision unnecessarily lays down the rule too broadly, and we have no hesitation in declaring that if the language of the opinion is to be interpreted as holding the rule to be of such indiscriminate and universal application in the matter of the interpretation of express contracts as to embrace all manner of such instruments, regardless of the language in which they are expressed, and including those which, in certain respects, the legislature has provided must be construed according to other rules adopted by it for that purpose, then we feel constrained to say that we cannot subscribe to it.

There is, however, no attempt made in the opinion in the Higgins case, 120 Cal. 629, [52 Pac. 1080], to combat the authorities which it is therein stated were "cited apparently holding that a contract of this nature must be conclusively presumed to refer to the statutory weights and measures— at least in the absence of a direct and express reference in the contract to a different standard."  Nor is there anything suggested in that case as to what disposition is to be made of section 3222 and the other sections of the Political Code fixing the standard of weights and measures.  The conclusion we have reached, after a careful examination of the question under discussion, is that all contracts involving "work to be done, or anything to be sold or delivered by weight or measure," must be, as required by section 3222, *supra,* construed by the light of the statute establishing in this state a standard of weights and measures, unless the parties have

expressly agreed to, or used language fairly indicating an intention to be governed by, a different standard; that if there ever existed anywhere in this state a custom or usage of trade in conflict with the sections of the Political Code referred to, it has been abrogated by those sections to the extent that the law shall prevail over such custom or usage of trade where the parties have not otherwise stipulated in their agreement. But we think that there are features in the Higgins case which distinguish it from this. The word "gross" is not used in the statute, and has, therefore, acquired no legal signification, whereas, as shown, the word "pound" is so used and is defined. That the phrase "gross ton" has a peculiar meaning in commercial usage is shown by the declaration of Justice Temple in the Higgins case "that the phrase 'gross ton' is often used in lieu of the phrase 'long ton' with which we are all familiar in commercial reports, and which always indicates a ton containing two thousand two hundred and forty pounds." The adoption of any other principle of construction than that by which we have been governed in reaching the conclusion here would, it seems to us, result in wiping off our statute books by judicial interpretation legislative provisions, against the wisdom of which no objection in our opinion can be made.

During the direct examination of James M. Reid, the plaintiff offered, and the same was received in evidence by the court, a letter, under date of March 17, 1900, addressed to Bell, and written and signed by Reid Bros. This letter called to the attention of Bell the fact that the steel-setters had experienced some difficulty in placing the steel columns, "the trouble resulting either from the improper placing of the brackets on the side columns, or the incorrect numbering of them." The inference from the letter was that the trouble and consequent delay was due to "shop errors" in adjusting the steel connections or mistakes made in marking the plan numbers by which the steel-setter should be governed in setting the steel, and for which errors and mistakes defendants were responsible. Testimony had been given on behalf of plaintiff that the steel materials had been marked with a shipping number which was plainly visible, and it also appeared that the plan numbers had been marked on the steel, but had been painted over so that they were somewhat obscure. The setter had undertaken to set the columns, etc., by the shipping

number and thus had made the mistakes which caused the delay in this particular. During the cross-examination of Reid, counsel attempted to put in evidence a letter from Bell to Reid Bros., dated April 6, 1900, upon the ground that it was a reply to the letter above referred to and explanatory thereof. The court sustained an objection to the admission of this letter. It is contended that the court erred in its ruling excluding the letter. The letter begins with, "I herewith return to you Mr. Arthur's bill of March 31st, and in reply will say that I have submitted a copy of this bill to the New York office, but in the meantime I do not consider Messrs. Milliken Brothers responsible for the mistake of Mr. Arthur in setting up the columns by the shipping number in place of the plan number." And then follows the explanation of how Mr. Arthur must have made the mistakes, and that the writer had pointed out the fact to him. The objection was that the letter was hearsay and self-serving. The offer was made, of course, under section 1854 of the Code of Civil Procedure, which provides that ". . . when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation or writing which is necessary to make it understood may also be given in evidence." The letter to which the one rejected is claimed to have been a reply is dated, it will be remembered, March 17th. The reference in the rejected letter to Mr. Arthur's "bill of March 31st" might indicate that it was not directly in reply to the letter of the 17th of March. There is, however, nothing in the excluded letter "which is necessary to make" the letter of March 17th understood. There is but one theory upon which we can perceive that the letter might have been properly admitted, and that is that Reid Bros., in their 17th of March letter, having at least by insinuation charged defendants with the delay due to the mistakes of the steel-setter, the refutation by the latter in the letter of April 6th of the charge would prevent the inference of acquiescence by apparent silence. But upon this theory the ruling is without prejudice to defendants, because Mr. Bell in his testimony (page 415, transcript) declared to the jury that the mistakes were due to the carelessness of the steel-setter; that Arthur had set up the steel according to the shipping numbers instead of the plan numbers; that the plan numbers were placed upon the materials so that they could easily be seen; that the

shipping numbers upon the columns did not correspond with the setting numbers upon the plans, and that he had pointed these facts out to Mr. Arthur. Thus, it will be seen, defendants presented to the jury all that could by any possibility have been shown upon that question by the rejected letter.

The witness Bell, in detailing a conversation he had with one of the Reid brothers, said, among other things, "that they would not hold us down strictly to February shipments." Upon motion of plaintiff the quoted portion was stricken out by the court, on the ground that it was "incompetent, irrelevant and immaterial testimony." The claim of plaintiff is that the statement is only a conclusion of the witness. The part stricken out appears with an extended statement made by the witness of a conversation with Reid and is presented in narrative form in the transcript, and it is somewhat difficult from the manner in which it thus appears to definitely say whether the language used by the witness was intended to represent what Reid actually said, or was only the witness' conclusion from what he said. The trial court was, of course, in a position to determine whether the part stricken out was a conclusion or not. But the ruling was harmless in any view, because, whether or not the shipments were to be made under the contract in the month of February was immaterial, if, as we think the evidence conclusively shows, the understanding of the parties was that shipments were in any event to be so made that the building could be completed and occupied by the 1st of July, 1900.

Nor do we think the court committed error in sustaining the objection to the question propounded to the witness Arthur: "The amount of the bill which you rendered for all of this riveting and reframing amounted to $189, did it not?" The witness had already testified that the amount of the bill for the work referred to was the sum of $189, and, therefore, no injury could have resulted to defendants by the refusal of the court to allow a repetition of the statement. The fact was before the jury for all the purposes for which it might be pertinently used in the case.

While Mr. Reid was testifying, a letter, written by his firm to the defendants, under date of June 8, 1900, was called to his attention on cross-examination by appellants, and on their motion admitted in evidence. The letter related to the differences arising between plaintiff and defendants by reason

of the delay in the completion of the building, and the causes thereof. On redirect examination, the witness, over the objection of counsel for defendants, was permitted to explain to the jury "under what circumstances that letter was written." The question elicited a statement to the effect that plaintiff was anxious to settle the trouble, and that witness had in view the purpose of "getting the lowest amount Hale would want to settle for, irrespective of figuring the damages, which it was impossible to do at that time." The letter fixed "the total time of delay at the minimum for the sake of amicable settlement, namely, one month and a half." As the time of delay suggested as the basis of settlement in said letter was considerably less than that to which the witness had testified in the case, it was important to present the reasons why and circumstances under which the letter was written. The objection was, we think, without merit. Defendants introduced the letter into the record, and if there were any inconsistencies or apparent inconsistencies between the statements contained in the letter and the testimony previously given by the witness on any material point in the controversy, it was proper for the witness, who was the author of the letter, to explain them. A witness who has made at another time statements at variance with his testimony would have the undoubted right to explain or reconcile them with his evidence as given in the case, if he could do so. There can be no reason why the same principle should not apply where the explanation is as to a letter written by the witness, where, of course, there is not imported into such explanation a statement of extraneous matters, or facts foreign to a legitimate explanation. The explanation seems to have been well within the purpose for which it was offered, introducing nothing which could serve any other end than to show the reason why the proposition submitted in the letter was made.

The following instruction was given by the court at the request of plaintiff: "The contract of sale is admitted in the pleadings. It is admitted that on or about the 10th of January, 1900, the plaintiff, Hale Brothers, purchased from the defendants, Milliken Brothers, and Milliken Brothers sold to Hale Brothers certain steel for their building to be erected in San Francisco, at certain prices per pound. That said steel was to be delivered f. o. b. New York City, during the

month of February, 1900. That said steel was to be prepared and shipped according to the plans and specifications prepared by Hale Brothers' architects. One of the specifications which became a part of the contract was as follows: . . . '' It is insisted by appellants that this instruction is erroneous for the reason that, as they contend, while the answer does not deny the contract for the sale of the steel, it does put in issue the allegation that such steel was to be delivered during the month of February, 1900, or during any specified month.

At the request of defendant the following instruction was given by the court: ''Defendants, in their answer, do not deny the making of the contract, *as alleged in the complaint* [the italics are ours] other than they deny that they agreed to deliver the steel at any other place than the City of New York, in the State of New York.''

The contract, as alleged in the complaint, is as follows: ''Plaintiff agreed to purchase and defendants agreed to furnish and deliver all the steel required by the plans, specifications and drawings made by the architects employed by plaintiff, to be used in the construction of a building to be erected by plaintiff on the lot of land leased, as aforesaid, by plaintiff from David R. Jones, at the following prices: . . . all of said steel work to be delivered f. o. b. to plaintiff during the month of February, 1900, to enable plaintiff to complete and occupy said building on or before the 1st day of July, 1900, and all of said steel work to be made and completed in conformity with the plans, specifications and drawings prepared by the aforesaid architects and delivered in such condition as to be immediately set up in said building.''

The court submitted for determination by the jury the question as to the place at which the steel was to be delivered. The complaint nowhere by direct averment declares that the steel was to be delivered at any other place than New York city. We are of the opinion that the instruction complained of contained a fair statement of the contract admitted by the answer, and concerning the existence of which there was no controversy at the trial. The question at issue was not, whether a contract had, in fact, been made by the parties, but whether or not there had been a breach of the terms thereof by one of the parties. The criticised instruction contains practically nothing more than was embraced in the

instruction, from which we have presented an excerpt, given by the court at defendants' own request. It is true the answer denied that delivery was to be made in the month of February, but, even so, the appellants are not in a position to complain of an instruction which, in effect, only harmonizes with one given by the court upon their own suggestion. Besides, as we think we have shown, it is clear from the evidence that haste in the completion of the building was the controlling feature of the contract, as understood by both parties, and as pleaded. The complaint avers that the parties entered into the contract of sale with a plain understanding of the terms of the lease between Jones and plaintiff, and thus discloses the importance to the latter of the completion of the building so that it could be occupied by the first day of July, at which time payment of the rent for the ground was to begin. What we have said with reference to the ruling striking out certain portions of witness Bell's testimony applies with equal pertinency and force to the point under discussion. The important element of the contract was haste in the delivery of the steel—that is, such prompt delivery thereof as would insure the completion of the building by the time desired. Of what moment, then, could it be whether the steel was delivered in February or at a subsequent time, if the object sought by prompt delivery were nevertheless accomplished? Under the circumstances of the case as developed by the evidence the instruction could not have prejudiced the defendants.

There are many other errors assigned, some of which are referred to in the briefs of counsel as worthy of notice, but we deem it unnecessary to give them special attention. We have examined them all with care, and can see nothing in them impinging upon the substantial rights of defendants.

The judgment and order are affirmed.

Burnett, J., and Chipman, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 3, 1907, and the following opinion was then rendered:

HART, J.—We have given the petition for a rehearing of this cause careful consideration, and are unable to discover any reason for changing our views, as expressed in the main

opinion, upon the questions discussed. It may be suggested that, since filing the original opinion in this case, there has come to our notice the recent case of *Leonhart* v. *California Wine Assn., ante,* p. 19, [89 Pac. 847], in which the court of the first appellate district discusses at some length the question of the resort to a custom or usage of trade for the purpose of interpreting the language of a written or other express contract. The authorities cited therein were not called to our attention by the attorneys in the case before us. We think some of them are applicable here. It appears to be the settled rule in this state, and ought to be, that where the contract is certain in its terms, parol proof of a usage is inadmissible. (*Withers* v. *Moore,* 140 Cal. 591, [74 Pac. 159].) We not only think that the rule thus stated is applicable here, but also reiterate our adherence to the position that, where a statute itself furnishes a rule of interpretation of certain contracts, as we think is the case here, that rule should be the sole guide of the courts in the interpretation of such contracts, unless the parties thereto, by said contract, have themselves interpreted the same, or furnished a rule by the stipulations of the contract for an interpretation different from that prescribed by the statute. The necessary effect of the application of the rule involved in section 1861 of the Code of Civil Procedure, to all cases of the interpretation of contracts, as contended for by counsel and as he insists is authorized by the opinion in the case of *Higgins* v. *California Petroleum and Asphalt Co.,* 120 Cal. 629, [52 Pac. 1080], would be to provide easy means of varying the terms of any written contract by parol, however plain and well understood the language of such contract might be. We cannot conceive a more dangerous application of a rule of construction or interpretation, and hardly think the court intended that section 1861, *supra,* should be pressed, in its application, to the extent to which the language in the Higgins case may be construed as carrying it.

We feel satisfied with the conclusion reached upon all the points made by counsel, and the petition for a rehearing will, therefore, be denied.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 31, 1907.