[Civ. No. 1470.   Third Appellate District.—March 31, 1916.]

## STANDARD AMERICAN DREDGING COMPANY (a Corporation), Appellant, v. THE CITY OF OAKLAND (a Municipal Corporation), Respondent.

CONTRACT—DREDGING WORK—MATERIAL SUBJECT TO HALF MEASURE- MENT—CONSTRUCTION OF SPECIFICATIONS.—In this action to recover a balance alleged to be due on a written contract between plaintiff and defendant for certain dredging work in a portion of Oakland harbor, wherein the sole controversy was over the question whether payment for material dredged from the side slopes of the channel within specified areas should be made upon the basis of full measurement or half measurement of the quantity removed, it is held that the specifications of the contract are to be construed as requiring that payment should be made therefor upon the basis of half measurement.

ID.—EVIDENCE—CUSTOM.—Where a contract for dredging work is sus- ceptible of a reasonable interpretation as to how the payment for material dredged from side slopes of channels shall be made, without incorporating in it any extrinsic provisions by evidence of usage or custom, the admission of such evidence is not prejudicial.

APPEAL from a judgment of the Superior Court of Ala- meda County, and from an order denying a new trial. Ever- ett J. Brown, Judge.

The facts are stated in the opinion of the court.

Snook & Church, and C. Irving Wright, for Appellant.

Paul C. Morf, City Attorney, John J. Earle, Deputy City Attorney, Ben F. Woolner, and Chas. A. Beardsley, for Re- spondent.

CHIPMAN, P. J.—This is an action to recover a balance alleged to be due on a written contract between plaintiff and defendant for certain dredging work done by plaintiff in a portion of Oakland harbor. The contract called for work specified as sections "A," "B," and "C." The controversy arises out of the work done in the area designated in the con- tract as 'Section A,' the approach channel." The facts as to the amount of the material dredged and the amount of money actually paid are not disputed.

The portion of the specifications of the contract called in question is as follows:

## "AREAS.

"For convenience of reference the area to be dredged is divided into 3 sections, Section A being the approach channel, Section B lying alongside the proposed bulkhead parallel to the Oakland Mole and Section C lying along the main bulkhead running in a general northeast and southwest direction.

### "DEPTH AND AREAS TO BE DREDGED.

"Section A, the approach channel, shall be dredged to a depth of twenty (20) feet below low tide.  The bottom width shall be five hundred (500) feet and side slopes shall be those assumed by the material during the dredging operations in said Section A. . . .

"Material dredged from below the specified depths or from beyond the specified areas as marked out by the City Engineer, and side slopes therefrom at rates not flatter than one vertical to four horizontal, will be estimated at half the actual volume of excavation and paid for accordingly, *provided*, however, that no payment will be made for material dredged from below a depth of one foot below the specified depth nor from a distance of more than ten (10) feet beyond said flattest limits of slope for said specified areas to be dredged.  All material must be removed down to the depth specified over the whole area to be dredged.  If soundings taken at the completion of any one section show a silting up to a depth of two (2) feet over a length of 200 feet the Board of Public Works may order such material removed by the Contractor and the City will pay for said work at the price bid for dredging."

This contract is dated January 31, 1911.  On May 13, 1912, some modifications of the original contract were made, and, among others, it was provided: "Section 'A,' the approach channel, shall be dredged to a depth of twenty-five (25) feet below low tide, and the bottom width thereof shall be not less than three hundred and fifty (350) feet."  Some changes were made in the dimensions of sections "B" and "C" and it was stated: "Top width of said sections shall be such as slopes may assume."  The principal change made by this last contract was to reduce the width of the channel from five hundred feet to 350 feet and increase the depth from twenty feet to twenty-five feet.

There were 140,506 cubic yards of material excavated on the side slopes, "not flatter than one vertical to four horizontal," which was "estimated at half the actual volume of excavation and paid for accordingly." Plaintiff claimed that it was entitled to full rates. The court found the facts and gave judgment in favor of defendant. Plaintiff appeals from the judgment and from the order denying its motion for a new trial.

Counsel for defendant have printed in their brief a rough diagram, figure 1, which we use. Of this diagram plaintiff's counsel say in their reply brief: "It is a little difficult to portray in language alone the situation as it exists. Counsel for the other side have given a very clear diagram showing the nature of the dredging operations, and we can do no better than respectfully to refer the court to the same for a picture of the situation."

Figure 1.

The explanation of this diagram is thus given in respondent's brief:

"The cut represents a section of a vertical plane of the channel. The rectangle ABCD represents the specified area as marked out by the engineer, having a width of 350 feet and vertical sides 25 feet in height. Theoretically the dredging is to be performed within this area and the material is to be removed therefrom, the side slopes being such as the material naturally assumes in the course of the operations. Were the material constituting the side walls of the channel composed of hardpan or some substance which would stand in a vertical position or without any tendency to slip, slide, or roll, there would be no side slopes and the channel would be confined within the lines AB BD CD. However, on account of the character of the material involved some sloughing is inevitable, and side slopes form. The lines EB KB LB MB NB OD PD FD represent some of the side slopes from the specified area assumed by the material in the course of the dredging operations, BE and FD being lines at the angle of one vertical to four horizontal, the flattest limits for which payment is allowed. The actual side slopes, however,

may lie without this limit, and the lines GH HI IJ represent the extreme limit of pay work, that is to say, an excess depth of one foot and an excess width on each side of the channel of ten feet beyond the one to four slope. The line RS is drawn to indicate the actual channel, dredged, as was in places the case, beyond the horizontal and vertical limits for which payment could be made.

"In the phraseology of the certificate of completion shown at folio 240 of the transcript, and in the language of witness Peck in his testimony as set forth at folios 237 to 245, 'main channel' is represented by the rectangle ABCD; 'slopes' by any of the triangles NBA CDO, etc., within the limits EBA CDF; 'excess depth' by the one foot space between the lines TBDV and HI; and 'excess slope' by the spaces inclosed within the areas EBTG FDVJ.

"There is no dispute as to the fact that for the excavation performed within the specified area of main channel ABCD plaintiff is entitled to payment at the rate of $.099 per cubic yard for the entire quantity of material removed; it is also agreed that for work upon the excess slopes and excess depths, that is between the lines EBDF GHIJ, plaintiff was to be paid for only one-half the actual volume of excavation performed; it is further stipulated that plaintiff was not to be compensated for removal of any material from beyond the limits GHIJ. The sole controversy is over the question whether for material dredged from the side slopes, that is any slope within the lines EBA CDF, the payment should be made upon the basis of full measurement or half measurement of the quantity removed."

It will thus be seen that the material involved was dredged from the area on the slopes above the lines EBA CDF, representing lines at the angle of one vertical to four horizontal. Soundings of the area to be dredged had been made by the city engineer for the information of his department and to aid him in the preparation of specifications for the work. A profile of the borings and field-notes thereof were filed in the engineer's office and were examined by plaintiff's engineers. The contractors, however, made their own soundings. The specifications contained the following provision: "Bidders are expected to visit and inspect the site of the work and the character of the material therein and will be furnished all available information in the office of the city engineer." These

soundings showed that there was much variation in the character of the material on the slopes. Some of the cross-sections had less depths of soft and more of hard or tough material than others, from which it was apparent that there would necessarily be less material to remove along the slopes at some places than at others. The dredging of the channel of the dimensions required with permanent vertical sides was not possible, for it was well known to all parties that the adjacent soft material would inevitably, to greater or less extent, slide into the channel unless removed, and it was less expensive to dredge this soft material as the work progressed than after it had slipped into the channel. The city was not concerned about this slope further than that it should be dredged to a depth sufficient to avoid the channel's filling in with material from that source. All the city desired was an open waterway of depth and width specified. Knowing, however, the character of the material underlying the water, as all parties did, it became necessary to provide in the contract for the dredging on the slopes as well as in the channel.

Except as to the channel, there could be and were no "specified areas as marked out by the city engineer." Necessarily the side slopes were "those assumed naturally by the material during the dredging operations in said section A," but the exterior boundaries and the depth of these slopes varied as the character of the material varied. Where, for example, there was little soft material with hardpan or clay underneath, the slope might be one to one and running back but a short distance, but where the material was soft for considerable depth, the slope might and did extend back many feet.

Another feature of the work should be noticed—that the head or cutter was often allowed to reach beyond the vertical lines in excavating the specified area or channel. One of plaintiff's witnesses testified: "Q. Why was it necessary, if you know, to dredge outside the limits of the dredging area for which pay was allowed? A. Two reasons. In the first place, it is impossible to locate the head of the cutter exactly. The only thing the man running the dredger has to go by is this line of piles along here and some stakes set outside [indicating on the blackboard]. He cannot see the head of the cutter. The dredge swings on a vertical axis. He cannot tell where the head of the cutter is, and in order to be on the safe side and dredge enough, he goes a little outside the line.

Another reason is that it is practically a universal experience that the slope does not say [stay] as dredged. That is, the chances are that, while depending on the time and the material, the slope will flatten off by the material sliding into the channel. For fear that material will slide, it is necessary to dredge the bottom wider, because the original side slope is likely to flatten in the course of time.''

The contention of plaintiff is thus briefly stated: ''It is apparent that the channel in the Key Route Basin where the tide ebbs and flows could not be dredged to a depth of twenty-five feet below low tide, with vertical banks, and that side slopes were unavoidable and that this was contemplated by all the parties to the contract; and that material dredged from side slopes between the vertical line and the one vertical to four horizontal line was within the specified area to be dredged; and that material dredged from below the specified depths, and from beyond the specified area, that is, beyond the side slopes therefrom, at rates flatter than one vertical to four horizontal, would be estimated and paid for at one-half the actual volume of excavation; and that material dredged from the channel and side slopes therefrom at rates not flatter than one vertical to four horizontal were all to be paid for at full price of 9.9 cents per cubic yard, estimated at the actual volume of excavation.'' Plaintiff's assumption is that the ''specified areas as marked out by the city engineer'' included the ''side slopes not flatter than one vertical to four horizontal'' as well as the channel itself, and hence the material from both these areas was to be paid for at full rates. The contract provided that the contractor was to be paid: ''Nine and 9/10 (9-9/10) cents per cubic yard for all materials dredged as required by the plans and specifications therefor, and this contract.'' We must turn to the specifications above quoted to ascertain the intention of the parties.

The only lines which the city engineer could mark out with any degree of certainty were the vertical lines of the channel. As already noticed, the material on the slopes was of such variable character that no one could tell definitely the depth or extent of the soft material, or of the hard material, or where the exterior lines of the slopes would be. In some parts the hardpan was found near the surface of the ground beneath the water, and the slope at such point would extend back but a short distance and the material dredged be easily

removed. At other points the slopes extended back some distance, because of a greater quantity of soft material encountered before reaching hardpan or firm earth that would not slip into the channel. It seems to us that the natural and grammatical construction of the specifications is, as claimed by defendant, and as was held by the lower court, that three classes of material were to be subjected to half measurement and paid for accordingly, namely: "1. Material dredged from below the specified depths"; that is, depths that were definitely fixed—as in the channel. "2. Material dredged from the specified area as marked out by the city engineer"; that is, beyond the fixed lines of the channel; "3. Side slopes therefrom [from the specified area] at rates not flatter than one vertical to four horizontal, with a proviso that no payment would be made for material dredged beyond certain vertical and horizontal lines." That is, the phrase, "will be estimated at half the actual volume of excavation," is qualified by what precedes it and relates to dredging "below specified depths"; to dredging "from beyond the specified areas" and to "side slopes therefrom [from the specified area] at rates not flatter than one vertical to four horizontal." And the limiting clause which follows seems to confirm this view, for it expressly provides "that no payment will be made for material dredged from a depth of one foot below the specified depth nor from a distance of more than ten feet beyond said flattest limits of slope for said specified areas to be dredged." The parties understood that side slopes were inevitable and dredging to some extent below specified depths, for the exact depth could not always be maintained, and so a limit as to depth beyond which no payment would be made was provided for and a one-half rate was fixed for dredging on slopes not flatter than one to four, and no payment would be made for material dredged "from a distance of more than ten feet beyond" this slope of one to four. We are unable to accept plaintiff's construction, for by it there would be no material subject to half measurement except such as was situated beyond the area specified by the city engineer and also beyond "the side slopes therefrom." Grammatically, as the specifications are phrased and punctuated, the verb "will be estimated" had for its subject material "from beyond the specified depths" and "from beyond the specified areas," and, as a further subject, the "side slopes." In determining what

was intended by the one to four line, we must assume that the parties contemplated that it was to subserve some function. Naturally, if not necessarily, there had to be some provision limiting the excavation which was subject to half measurement rather than to establish a boundary line. The method adopted of prescribing what should be treated as the flattest limit of slope and fixing the exterior boundary line at a prescribed distance from such line, it seems to us, was as fair as could have been suggested under all the circumstances. As respondent puts the matter: "The exterior boundary was to be either the wall of the side slope naturally assumed by the material as the dredging progressed, if steeper than or equal to one vertical to four horizontal, or, if that slope were flatter than one to four, then an imaginary line parallel with and distant ten feet horizontally beyond the one to four slope from the specified area. For any dredging outside that imaginary line no payment was to be made. In other words, if the material were to assume a slope of one to five or one to ten, it would be measured just as if it had assumed a slope of one to four, the allowance of ten feet would be made, and, for any excavation performed beyond that limit, plaintiff would not be entitled to compensation. On the other hand, where the slope of the material should remain at an incline of one to one or one to three the measurement would be of the side slope actually assumed. The one to four line is described as a necessary factor in establishing the limit of the slope and the exterior boundary of the excavation for which payment was to be made; and is not defined or described or established and does not purport to be defined or described or established for any other reason or purpose whatsoever."

Without further pursuing the inquiry, we think this is a reasonable view to take of the provisions of the contract in question. Respondent suggests that if any uncertainty exists in the contract, it must be assumed that such uncertainty was caused by the private party, the contract being with a public officer or body as such (Civ. Code, sec. 1654; *Miller* v. *Grunsky*, 141 Cal. 441, 451, 453, [66 Pac. 858, 75 Pac. 48]) ; and if in the contract there be any word, phrase, or clause of doubtful meaning, "it is to be presumed that the private party was responsible for the insertion and use thereof, and

the language of the instrument is to be interpreted most strongly against him or it."

Certain alleged errors in rulings by the court are assigned as prejudicial. Plaintiff's witness Peck, a civil engineer, testified that he had examined the final certificate of the city engineer with reference to the channel dredged known as section "A." The following question was then put to him: "Do you know from your investigation and your own knowledge of the certificate whether or not it states the facts with reference to the amount of material dredged?" An objection was sustained on the ground that the question called for the conclusion of the witness and that the certificate is the best evidence; further, also, that it was in form an omnibus question and did not call the attention of the witness to any particular thing. Later, in response to a question as to what investigation he made concerning the various items in the city engineer's final certificate, he stated that he "checked over these quantities as given by the soundings, cross-section soundings by the field force of the city engineer, and found the quantities correct as stated here." The court granted a motion to strike out the words "and found the quantities correct." He stated that he assumed the soundings to be correct but that he made his calculations with the city engineer's force; "we checked each other on these calculations." He was not allowed to "state what the figures there represent." However, he was allowed to state what he found after making these calculations, which was that "these figures as stated here give the actual amount excavated . . . in section 'A' within the limits of the channel as defined by the specifications" and he also included the work on the slopes. The witness was finally allowed to state the facts as to the amount of material excavated and that "the figures as stated give the actual amount." This, it seems to us, met the purpose of the questions objected to. Besides, the parties stipulated as to the quantity of material dredged by plaintiff. The court sustained objections to questions concerning the custom with reference to the payment for the excavation of side slopes. The matter sought to be elicited came out and was testified to without objection. Questions were objected to, and objection sustained, seeking the opinion of the witness whether or not "a civil engineer who is a city engineer of a city having a water front should have knowledge of a general custom or

usage of paying at full price for the volume of material dredged up to the specified limit of the side slope of the channel, to be dredged in waters adjacent to the city, provided said city has done work of dredging in the waters along said water front.'' Also, ''should a civil engineer who has had practical experience of ten years or more, and who has prepared specifications for dredging in the waters of San Francisco Bay,'' have such knowledge?

It may be doubted whether the questions involved matter the subject of opinion or expert testimony. However, the witness was permitted to testify that civil engineers having seven years of practical experience in the vicinity of Oakland, of dredging work, would have knowledge of the general custom of paying full price for the actual value of material dredged up to the specified limits of the side slopes of channels to be dredged.

A witness for defendant, who was a civil engineer, and a member of the board of public works of Oakland when the contract was let, and who drew the specifications, was asked by the defendant: ''Did you know of any such custom? Was there custom or usage upon the subject?'' Referring to the custom as had been testified to, did he know of any such custom? Plaintiff's objection to its relevancy and incompetency was overruled. The witness answered the question: ''I would answer it 'no,' because that subject is usually covered by the specifications.'' On cross-examination, this witness was asked the following question: ''If the specifications did not mention side slopes at all, and they provided the dimensions and depth of channel and provided that the top width should be such as might be assumed by the side slopes, would you not consider that under the custom of the trade or usage of the trade, you should pay for all material dredged?'' Objection by plaintiff was sustained on the ground that it was not cross-examination.

The answer to the first of the last two questions was that there was no such custom. He did not answer whether he knew of such custom. It was permissible to ask the witness whether such a custom existed in rebuttal of plaintiff's evidence that there was such a custom. He gave no other testimony in chief. The next question was obnoxious to the objection made as not cross-examination. Besides, it called for an opinion upon the assumption that a custom existed which he had just

denied did exist. The question also called for the opinion of
the witness in a matter essentially within the province of the
court to decide.

Mr. Woolner, city attorney who advised the board in pre-
paring the contract, over plaintiff's objection was permitted to
testify that he did not "know of any custom in regard to pay-
ing full price for material dredged in channels from the side
slopes of those channels." The ruling is urged as prejudicial,
for the reason that it was immaterial whether or not the wit-
ness knew of such custom at the time the contract was entered
into, and did not tend to prove or disprove the existence of
such a custom. Appellant concedes that a local or special
custom must be known to the parties in order to be construed
as a part of the contract, but it is contended, and cases are
cited supporting the contention, "if it appears that the custom
is so general that the parties will be presumed to have knowl-
edge of it, then the parties to the contract are bound by its
terms, even though one or the other of the parties may claim
to have had no actual knowledge of such custom." On the
other hand, cases are cited by respondent holding that where
the custom is restricted to a particular business, it is permis-
sible to show that one of the parties did not know of its exist-
ence. The evidence on the subject was directed to a custom
with regard to a particular feature connected with the dred-
ging business generally, not only in the waters of the bay of
San Francisco, but elsewhere, rather than to a custom as to
a particular business in the sense treated in the cases cited by
respondent. Upon the question, however, whether such a gen-
eral custom existed, there was some conflict in the evidence
which the court had the right to consider in making its ruling.
If the court held, as we may assume it did, that the general
custom was not satisfactorily proven, it was not error to allow
defendant to show want of knowledge of what was but a spe-
cial or local custom.

It is to be observed that this question of custom is usually
invoked to supply something as to which the contract is silent,
or, as Mr. Greenleaf says, the true office is to "interpret the
otherwise indeterminate intentions of the parties and to ascer-
tain the nature and extent of their contracts, arising, not from
express stipulation, but from mere implications and presump-
tions, and acts of a doubtful and equivocal character; and to
fix and explain the meaning of words and expressions of

doubtful or various senses." (Greenleaf on Evidence, sec. 251.)

The supreme court said, in *Burns* v. *Sennett,* 99 Cal. 363, 371, [33 Pac. 916, 919] : "A usage, of course, cannot be given in evidence to relieve a party from his express stipulation, or to vary a contract certain in its terms; but it has a legitimate office in aiding to interpret the intentions of parties to a contract, the real character of which is to be ascertained, not from express stipulations, but from general implications and presumptions."

It appeared from the testimony of some of the witnesses that it was quite common for specifications in dredging contracts to provide for payment of side slopes at full rates, and other witnesses testified to the usage being that way because provision was generally made in the contract for such payment. We do not think that any just inference could be drawn from express provisions of contracts relating to dredging that in the absence of such provisions there would be implied agreement to make such payment. That it is the fact that a certain provision is generally inserted in a contract does not tend to prove that there is a usage that such provision would be given effect where the contract is silent on the matter. The real question is: What is the usage apart from the contract? If the contract deals with the particular fact in a way to be reasonably clear as to the intention of the parties, usage has no office to perform. We think the contract here is susceptible of a reasonable interpretation without incorporating in it any extrinsic provisions by evidence of usage, and that whether or not error was committed in ruling upon this question of usage, it was not prejudicial. In making its findings we think the court was justified in disregarding the evidence as to usage as we infer it did in not making any finding on that question. (See a discussion of the subject in *Hale Bros.* v. *Milliken,* 5 Cal. App. 344, 353, [90 Pac. 365].)

Some of the findings are attacked, and particularly finding VI, which is: "That it is not a fact that plaintiff dredged in the side slopes from said section A at rates not flatter than one vertical to four horizontal 144,506 cubic yards of material; and, in this connection, the court finds that no evidence was introduced at the said trial from which the court could determine the quantity of material dredged from said side slopes from said section A at rates not flatter than one vertical to

four horizontal, and placing its finding upon that ground the court finds that it is not a fact that plaintiff dredged from said side slopes 144,506 cubic yards of material or any other quantity of material, or any other number of cubic yards of material.''

Certificates of work done were made from time to time on which plaintiff was paid, and from these certificates a final certificate was signed by the city engineer on which plaintiff received final payment. The account as finally certified to was as follows:

"Main Channel...... 998340.9 cu. yds.                     998340.9 cu. yds.
 Slopes ............ 144506.0 cu. yds. ⎤                   72253.0 cu. yds.
 Excess slope....... 41775.8 cu. yds. ⎬ less ½   20887.9 cu. yds.
 Excess depth...... 55989.4 cu. yds. ⎦                    27994.7 cu. yds.
                                                          ─────────────────
                                                          1119476.5 cu. yds.

1119476.5 cu. yds. at $.099............................$110828.17

"At said City of Oakland, this 7th day of March, 1913.
                                    "PERRY F. BROWN,
                                        "City Engineer.

"Correct
            "T. E. RISLEY,
                "Asst. Eng."

Mr. Risley testified that the matter of the interpretation of the contract came up between the witness and plaintiff's representatives, Mr. Beardsley and Mr. Peck, and also Mr. Perry, president of plaintiff company, upon the point whether "the values outside of the vertical lines should be considered as full value or not. The matter of showing excess slopes was not taken up by Mr. Beardsley until the time the final estimate was made.'' The monthly statements for August and September, 1912, showed but a single item for dredging, but on and after October, 1912, the statement showed the work on main channel and the slopes, and when there was any work done on excess depth that also was shown. It was because of this early disagreement as to the interpretation of the contract that the certificates were made up in this way. Mr. Risley testified that "in figuring the quantity of material dredged and the amount due thereunder no allowance was made for full measurement or full payment, outside of the vertical lines.'' Payment was made and received under these certificates thus made out, but we understand that the question remained open as to the controverted interpretation of the contract.

The court found (finding II): "That defendant paid to plaintiff the sum of $7,153.05 for dredging 144,506 cubic yards of material outside of section A and outside of the specified area and between said specified area of said section A and a line sloping from said section A at the rate of one vertical to four horizontal, all estimated upon the basis of one-half of the actual quantity of excavation in full accordance with said plans and specifications." The only dredging in controversy was that done between the lines thus designated. As to the dredging in the main channel and below the one to four line, no controversy arises. The findings are so drawn, we think, as clearly to present the question at issue. They in effect hold that the specified area referred to in the contract is the area within the vertical lines, that is, the channel, and to be paid for at full rates; and that the area embraced between those lines and the lines of the slope of one vertical to four horizontal was to be paid for at half rates. Unless the contract may be interpreted in harmony with such findings, the judgment has no support. Otherwise, the judgment must stand.

Our conclusion is that the findings are supported by the evidence. The judgment and order are, therefore, affirmed.

Burnett, J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 28, 1916, and the following opinion then rendered thereon:

THE COURT.—We are asked to grant a rehearing, our attention being called particularly to two matters as to which it is suggested the opinion may be misleading:

First. In the second or amended agreement certain changes were made in the dimensions of sections A, B and C and directions were given as to the dredging to be done. In that connection the following appears: "Top widths of said sections shall be such as slopes may assume. And said contractors agree to dredge all material from such areas adjacent as may be ordered," etc. We think the above paragraph refers to all three sections, and if the opinion leaves any doubt upon the subject, this is to remove it.

Second. The point was suggested in respondent's brief that if there is any uncertainty in the contract, it must be

assumed that such uncertainty was caused by the private party, the contract being with a public officer or body as such (Civ. Code, sec. 1654), and the language of the instrument is to be interpreted most strongly against the private party.

In the opinion filed we stated the point made by respondent, but made no comment upon it and, in fact, did not apply the statutory rule. To relieve the opinion from any implication that importance was given to the matter, the reference to respondent's brief may be disregarded. We still think that "the specified areas as marked out by the city engineer" were the areas embraced within the vertical sides of the channel, and that the said slopes therefrom not flatter than one vertical to four horizontal were to be estimated and paid for "at half the actual volume of excavation." We do not think that the provision in the agreement of May 13, 1912—"Top widths of said sections shall be such as slopes may assume"—affects the provision in the original contract.

The petition is denied.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 29, 1916.